SUPPLEMENTARY ADJUDICATION
TAXIS, P. J.,
— In an adjudication *408 dated January 20, 1970, we ruled upon a variety of claims and other matters involved in this very complex administration. We also had before us at the same time a claim by Dr. James G. Walker, brother-in-law of decedent, for $59,971.86, which had required the taking of some 1,000 pages of testimony and exhibits. In the adjudication, the court noted that it did not wish to delay disposition of all of the other matters until the record, arguments and briefs on the Walker claim could be analyzed, since the administration of the estate was then four years old. We now rule on the Walker claim.
A summary of the allegations of the statement of claim is in order. It sets forth that in December 1964, about six months before decedent’s sudden and unexpected death, he orally requested Dr. Walker to purchase for his wife, Sarah W. Huebner, all of the furnishings and decorations required to equip her and Mr. Huebner’s new home. It is further alleged that decedent knew that Dr. Walker had been a purchaser and collector of antiques and furnishings and had many of these at his own home. Decedent also allegedly stated that he would be interested in having claimant select items from his own collection. It is then set forth that Dr. Walker prepared furniture floor plans for the home, and that, still in December, decedent authorized claimant to purchase the furniture, furnishings and decorations, including upholstering and refinishing of furniture, as indicated on the plans. Claimant purportedly carried out the project and selected items from his collection and from other shops and suppliers which, after approval by decedent or Mrs. Huebner, were delivered to the house. Then follow details of the purchases made. The largest single group was from Dr. Walker’s own collection, allegedly worth $26,138.08 at its fair *409 market value, which amount decedent, it is contended, agreed to pay. There were also acquisitions from numerous other suppliers, at amounts ranging from $30 to $7,662.58. In most cases, it is alleged that the articles and prices were approved by decedent prior to his death, while in the balance it is simply alleged that the items were purchased and the prices agreed to by Dr. Walker and Mrs. Huebner on behalf of decedent.
Thus, there are two principal branches to the claim. In the first, Dr. Walker asserts a sales contract with decedent for the purchase of items owned by him. In the second, he seeks to constitute himself the representative of decedent, authorized by Mr. Huebner to buy and pay for items on his' behalf and thereafter be reimbursed. Unlike certain claims dealt with in the prior adjudication, this should not properly be termed an agency, as it is not contended that Dr. Walker had the power to make contracts between the suppliers and Mr. Huebner, or that he did make any such contracts; however, from the practical standpoint it makes little difference, as the liability of the decedent, and the estate, is nevertheless asserted only to Dr. Walker and not the individual suppliers.
Claims against decedents’ estates based on contracts entered into during life are usually held to a relatively high standard of proof. It was said, for example, in Petruzzi Estate, 410 Pa. 554, that the evidence to prove such claims must be “clear, direct, precise, and convincing.” With logic, the law generally regards claims against estates which could have been presented during life with some suspicion, and for that reason requires shch clear and definite proof. However, here we are dealing with a furnishing and decorating project extending over many months, and which was still in process at the time of decedent’s *410 sudden and unexpected death. Therefore, the fact that Dr. Walker had not presented his claim or been reimbursed prior to Mr. Huebner’s death does not raise any unfavorable inference against him.
Certain facts are substantially undisputed, and constitute an interesting background. Mr. and Mrs. Huebner were married on June 17, 1964. Shortly before, decedent had acquired a lot in Penn Valley, Lower Merion Township, and there he built a new home for his wife and himself. The property is on Rosemary Lane, and will be referred to in that way hereinafter. Mr. Huebner kept the title in his own name after his marriage. The couple moved into the house shortly after their marriage, having decided to decorate it in an impressive and elaborate fashion. They utilized the furnishings from their former residences only temporarily.
Mr. and Mrs. Huebner’s first attempt to engage an interior decorator and designer was frustrated when the decorator suffered injuries in an automobile accident. They then contacted Dr. Walker who, although a dentist by profession, had great interest and experience with the acquisition, refinishing, and use of furnishings, antiques, decorative items and the like. It was shown that Dr. Walker’s office and residence on Delancey Street in Philadelphia had been opened to public view on one occasion, on account of its furnishings and decorations. Dr. Walker is Mrs. Huebner’s brother, and Mrs. Huebner had resided at his address prior to her marriage to decedent. Mrs. Huebner testified that her husband agreed to pay Dr. Walker 15 percent of the total cost of decorating the house as his fee, but that amount is not claimed in the present litigation.
It is not disputed that Mr. Huebner was familiar with Dr. Walker’s large collection, having seen it *411 on numerous occasions when he visited his intended wife at Delancey Street. It is likewise clear that he greatly admired various pieces in the collection and desired to acquire them for his new home; although it does not appear that he had great expertise in the area of furnishings or decorating, he was intelligent and refined and undoubtedly knew what he liked. Moreover, several witnesses testified that he had a great desire to please Mrs. Huebner, who herself was a designer, in decorating the Rosemary Lane home. Starting early in 1964, before the marriage, and continuing for a year or more, Mr. and Mrs. Huebner and Dr. Walker together identified items in the Walker collection which were to be acquired. From time to time the items were embodied in lists made by Mrs. Huebner. According to her, these lists were not all made at one time, being written on various sorts of paper, but they were admitted into evidence as one exhibit “W-6.” They purport to contain all of the items from Dr. Walker’s collection that Mr. and Mrs. Huebner desired to buy. The total of exhibit “W-6” appears to be $23,528.69, and this sum must be regarded as the amount sought by Dr. Walker in this portion of his claim. Mrs. Huebner further testified that the prices for the items set forth in exhibit “W-6” were agreed upon by decedent and Dr. Walker, and that she wrote them on the lists at various times as agreement was reached. On these facts, claimant argues that the estate is liable for the prices of the items in exhibit “W-6.”
The estate counters with a denial that an enforceable contract exists. It first argues that the statute of frauds contained in section 2-201 of the Uniform Commercial Code, 12A PS §2-201, renders these sales unenforceable. We do not agree. While the furnishings and decorations were the major cost of decorat *412 ing the house, they were purchased by Dr. Walker as part of the services he was performing, and indeed the agreement included compensation to Dr. Walker. It is questionable whether such an agreement is within the statute: Stone v. Krylon, Inc., 141 F. Supp. 785; section 2-106 of the Uniform Commercial Code. Moreover, while the evidence is conflicting as to just which or how many of the items from Dr. Walker’s collection were delivered to Rosemary Lane before decedent died, it is evident that a considerable number were, and were seen there and approved by Mr. Huebner. This would be sufficient acceptance to take the contract out of the statute of frauds.
And finally, regardless of delivery to Rosemary Lane, we are satisfied that the individual items in question were sufficiently familiar to Mr. Huebner, whether he saw them at his home or not, and that his agreement to purchase them on the basis of this knowledge was also sufficient acceptance for present purposes. Certainly, the rules requiring receipt and acceptance of goods in order to enforce an oral contract were meant to apply, under sales law, to situations where the merchandise is purchased by quantity or description or is otherwise not specifically known to recipient prior to receipt; the concepts make little sense when applied to unique and individual items known to, and actually selected by the buyer.
The estate next contends that the contract is unenforceable because of vagueness. We agree that it is, in some respects, imprecise. But the court is satisfied that Mr. Huebner agreed to purchase furnishings and decorative items from Dr. Walker’s collection and that the lists of those items submitted are reasonable and adequate if not irrefutable evidence, under all the circumstances of the case, of what he agreed to *413 purchase. Further, the probative value of the lists is somewhat strengthened by other facts in the case: Mr. Huebner had long been familiar with these items, was engrossed in having Dr. Walker decorate the Rosemary Lane home, and, further, many of the items were delivered there before Mr. Huebner died. An associate of Dr. Walker, Dr. Owens, testified that he and Dr. Walker had personally delivered the greater part of the items in question to the house, which confirms the fact that Mr. Huebner had agreed to acauire them.
None of these facts, however, in any way proves that Mr. Huebner agreed to pay the specific prices which Dr. Walker claims, the only testimony on this being Mrs. Huebner’s statements to this effect, as previously noted. We must hold that the evidence in this respect does not rise to the required standard of proof. However, the estate concedes that this does not render the contract unenforceable. If a sales contract fails to fix the price but is otherwise complete, the seller may recover the reasonable value of the goods: Uniform Commercial Code, supra, section 2-204; Kuss Machine Tool & Die Co., Inc. v. El-Tronics, Inc., 13 D. & C. 2d 1, affirmed 393 Pa. 353. In recognition of this, both sides have produced expert testimony as to the alleged fair value of the items purchased from Dr. Walker.
The first witness presented for this purpose was Dr. Walker himself, who testified subject to a reserved ruling on his competence. The court believes, after reflection, that Dr. Walker’s knowledge of the matters in issue was extensive and particular enough to qualify him as an expert. Undoubtedly, his experience is practical and not professional, and this would affect his credibility and the probative value of his testimony, but not its admissibility. However, we *414 are compelled to rule that this testimony is inadmissible because of the Act of May 23, 1887, P. L. 158, section 5, 28 PS §322, the dead man’s act. Counsel for Dr. Walker argued that he was simply proposing to testify to a current or post-mortem fact, namely, the value of the purchased items. This contention is based on Friel Estate, 86 Montg. 345, 40 D. & C. 2d 101, wherein this court allowed a claimant to testify to present circumstances or facts, even though by implication these tended to prove the existence of like circumstances or facts prior to decedent’s death. The cases differ factually, however. In Friel, claimant identified, after decedent’s death, checks which had been endorsed over to decedent by her, although this tended to prove transfer of funds by her to decedent ante-mortem; in this way, claimant established her prima facie right to repayment. The checks were independently existing evidence, however, and could have been identified for any relevant purpose. They only incidentally showed that the funds had been transferred before decedent’s death. Here, however, a different rule applies, since the testimony of Dr. Walker, though in form it deals with facts existing after death, necessarily relates, and is presented solely for this purpose, to facts occurring prior to death. While the distinction is not broad or in all cases absolutely clear (see Keating v. Nolan, 51 Pa. Superior Ct. 320), the effect of Dr. Walker’s testimony would be to show how much decedent had legally obligated himself to pay, to which fact, had it occurred with reference to an express contract, claimant would clearly have been incompetent to testify. “To permit the survivor to do directly (sic) that which he may not do indirectly (sic) would in effect destroy the very purpose for which the Act of 1887 was intended”: Psinakis v. Psinakis, 177 Pa. Superior Ct. 250, 253, *415 where claimant was not permitted to testify that the debt for which he was suing had never been paid. We think Dr. Walker’s testimony is equally closely related to his claim, and must be excluded.
Two other experts also appraised the items purchased from Dr. Walker. The first, for the claimant, was Joseph Sorger, an interior designer and decorator of many years’ experience. The appraisal made by Mr. Sorger is set forth in exhibit “W-44.” This .is basically the typewritten appraisal originally made by the other appraiser, Edmund D. Brickley, of Samuel Freeman & Co. Mr. Sorger’s values appear in handwritting immediately to the left of the typewritten figures, which are Mr. Brickley’s values, to be discussed later. Actually, exhibit “W-44” is an appraisal of all of the items involved in this claim, not just those purchased from Dr. Walker. The court has carefully analyzed this exhibit and has culled from it the items supplied by Dr. Walker, in order to determine their values as fixed by the appraisers. For items and pieces priced at about $23,500 by Dr. Walker, in his statement of claim and evidence offeree in support of it, Mr. Sorger supplied a valuation of approximately $34,400, this covering in excess of 350 separate items. For a number of reasons, we cannot accept this value for present purposes. First, it appears that Mr. Sorger is engaged in the business of designing and equipping interiors, and as an integral part of this service, he supplied the items necessary to fulfill his designs; their prices, however, include a substantial mark-up, from which Mr. Sorger obtains a considerable amount of his profit. Further, Mr. Sorger admitted that he appraised the items at 1968 values, which were 10 percent to 15 percent higher than in 1965. And there was a considerable additional uncertainty created by the wit *416 ness’s inexact handling of other factors related to his ultimate opinion, such as availability or discounts, depreciation to be considered, etc.
The substance, therefore, of Mr. Sorger’s appraisal is that it sets forth the approximate prices he would charge his customers for these items. This is not overly helpful in a situation where the sales took place under quite different circumstances. We must determine the fair market value of these items. “Fair market value” means to this court, in general, the price which would be paid to a person who is willing but not required to sell, by a person who is willing but not required to buy. It is not “liquidation” value, for this imports pressure upon the seller to sell, nor is it “replacement” value as such, because in that situation the buyer may be in a position requiring him to buy. Of course, this is a very general concept, and cannot be expected to produce exact results; but it is evident that the relatively unique and distinctive items involved in this claim do not lend themselves to the establishment of a precise value. Mr. Sorger has priced these items as though they were to be supplied by him as part of a package, that is, a complete decorating project for one of his clients. In the present case, there is no evidence that Mr. Huebner ever dealt with Dr. Walker on this “all-or-nothing” basis.
Taking a second journey through exhibit “W-44” with the adding machine, we next determined that Mr. Brickley, the estate’s appraiser, valued the same items at about $17,400. There are problems with the probative value of this appraisal, however, as well as with Mr. Sorger’s. Mr. Brickley’s experience lies in valuation mainly for the purposes of an auction house. Although he stated that he made many appraisals for tax and insurance purposes without ref *417 erence to sale of the items involved, it is nevertheless clear that his knowledge of prices comes principally from the business activities at Freeman’s. We do not disbelieve Mr. Brickley’s testimony that he observes catalogues, prices at other stores and shops, and advertisements, and the appraisals which he makes for tax or insurance purposes are undoubtedly numerous and responsible. But we think the evidentiary value of his testimony is affected by the source of his knowledge, and that his prices are likely conservative.
Mr. Brickley’s values were also, to some extent, successfully attacked on cross-examination. Counsel for claimant produced several pieces from the Rosemary Lane home which had been appraised by Mr. Brickley at very low figures in comparison with Dr. Walker’s prices and what Mr. Sorger said they were worth. When Mr. Brickley was asked to appraise them from the witness stand, without reference to his written appraisal, his valuations in most cases rose considerably, and in at least two cases he expressed bewilderment at his first valuation. The damaging effect of this, of course, must be tempered in the light of the vast number of items which Mr. Brickley had appraised just in this case, not to mention in other appraisals made by him every day. Nevertheless, it appears there is a considerable range of valuation possible here, and that Mr. Brickley’s prices are somewhat below fair market value.
The prices put on these items by Dr. Walker fixes the maximum amount of his claim. For that reason and others previously stated, we do not accept Mr. Sorger’s valuations nor will the court limit recovery to the values used by Mr. Brickley, which we think are low. In consideration of the fact that Dr. Walker himself fell somewhat short of showing that his claim was as large as originally set forth in the statement *418 of claim, we shall hold that the fair market value of these items is $20,000 and allow Dr. Walker’s claim for items sold to Mr. Huebner in that amount.
We now turn to the consideration of Dr. Walker’s claims for reimbursement for sums paid to other suppliers of furnishings and decorative items used in decorating the Rosemary Lane home. Claimant’s brief contains a helpful listing of these payments arranged largely as the evidence concerning them was presented. They will be considered in that order.
Preliminarily, however, the general basis for adjudicating these claims should be understood. As indicated previously, the court is satisfied that Mr. Huebner authorized Dr. Walker to plan and supervise the decoration of his home, and in doing so, select suitable items and arrange to obtain them. This process consisted, in the case of major purchases, of Dr. Walker locating items which he thought would be suitable, and then directing Mr. and Mrs. Huebner to look at and approve them. We believe that the key to the estate’s liability is, simply, whether or not Mr. Huebner approved the purchases. Claimant’s contention, not made in so many words but urged in effect, that he himself had an unlimited right to select and purchase any items required to decorate the house, is not supported by the record. Mr. Huebner undoubtedly desired to please his wife very much, and his approval might well have been obtained in many cases where, in fact, it was not, had he lived. Be this as it may, however, the court concludes that in order to bind the estate for the cost of these items, there must be reasonable evidence that Mr. Huebner specifically agreed to their purchase. To hold otherwise would mean that Dr. Walker, and Mrs. Huebner also, had unlimited authority to buy in Mr. Huebner’s name. There are, perhaps, some inferences in Mrs. *419 Huebner’s testimony that such was the case, but they are by no means strong enough to support a conclusion of such consequence.
This finding is otherwise reasonable, as well. Several witnesses indicated clearly that furnishings and other decorator items are often sold subject to return if they proved unsuitable. One case involved the purchase of rugs by Mr. Huebner, which were satisfactory in design but too small for the rooms in which they were to be placed. These were returned, apparently without difficulty. Two dealers from whim Dr. Walker purchased merchandise involved herein testified that sales were often made subject to return, and apparently this is an inbuilt condition in this business; in order to sell this type of merchandise in the first place, suppliers must be willing to take it back if it is unsuitable, especially if the purchaser is a valued customer like Dr. Walker. Thus, it would have been largely unnecessary for Dr. Walker to have been authorized to purchase without Mr. Huebner’s final approval, since most of the merchandise could have been returned had it been later found unsatisfactory.
In some of the claims to follow, there is reasonable evidence that Mr. Huebner saw most or all of the items prior to their purchase, from which the court is willing to infer his approval. In others, proof of this element is entirely absent, and these claims cannot be allowed.
We consider first items bought from Herman L. Ruben, totaling $7,662.58. Mrs. Huebner testified here, and in most of the other claims as well, that Mr. Huebner had approved the purchase of all of the items included in the claim. In support of this conclusion, she explained that she and Mr. Huebner went to the Ruben store to see pieces which Dr. Walker *420 suggested might be used in furnishing the house. Mrs. Ruben, wife of the proprietor, was called as a witness and testified that the Huebners asked specifically to see a number of items later purchased by Dr. Walker. Her following testimony is vague and uncertain as to when and how delivery of the items occurred, and whether they were taken directly to Rosemary Lane or, initially, to Delancey Street, and there is also confusion as to when the items were paid for by Dr. Walker. We are, therefore, satisfied that Mr. Huebner was familiar with the great majority of the pieces purchased from Ruben, and that some, although not all, were delivered to Rosemary Lane during Mr. Huebners life. Accordingly, the Ruben claim for $7,662.58 is allowed.
The next item is a claim for $4,402.75 for articles purchased from Quality House, located at New Castle, Delaware. Mr. and Mrs. Huebner had also visited this establishment, and Mrs. Huebner again testified that all of the items had been approved by Mr. Huebner. Later, however, she conceded that a “few” of the items might have been brought up by Dr. Walker on his own motion, and she also said, “We may have seen some of the items first. I am sure we did ...” Mr. Vernon Hagan, proprietor of Quality House, was called as a witness, and testified that Dr. Walker assisted in delivering many of the items purchased, and that at least some of them went to Rosemary Lane. Under the view we have taken of the requirements for the allowance of these claims, there is some doubt as to whether any of the present one should be allowed, it being impossible to determine which items were actually approved by Mr. Huebner. However, there is no doubt that he did agree to the purchase of some of this merchandise, and we think that no substantial question should be raised to the *421 allowance of part of this claim. The Quality House claim is, therefore, allowed in the amount of $2,000.
We now pass to the claim for purchases from Kunzig & Steele, in support of which Miss Marjorie Kunzig testified. Miss Kunzig went to Rosemary Lane on occasions when Mr. Huebner was present. However, she dealt entirely with Dr. Walker and Mrs. Huebner in her negotiations and the ensuing purchases. The record concerning this claim fails to convince us that Mr. Huebner approved any items supplied by Kunzig & Steele. Miss Kunzig stated that she knew that Dr. Walker was decorating the Huebner home, and that as items came to her attention which appeared suitable for the purpose, she set them aside at her place of business for his and Mrs. Huebner’s consideration. A substantial number of these were purchased by Dr. Walker; but this does not prove that Mr. Huebner knew of these items and approved their purchase for his account. The Kunzig & Steele claim is disallowed.
The next claim is on account of kitchen and related items from National Products Company. These were not decorative items at all, but were utility items required in the kitchen. There is no evidence that Dr. Walker had ever been authorized to purchase items of this sort, and, in addition, Mrs. Huebner could not say that any of the items had been delivered before decedent’s death. The National Products Company claim is disallowed.
We come next to two leather wing chairs purchased from Wood & Hogan, Inc., of New York City, for $598. The evidence regarding this purchase is that Mr. and Mrs. Huebner went to New York to see the chairs in question, after seeing a list of Wood & Hogan products of potential interest to them. Mr. Huebner actually saw the chairs in question near the end.of *422 1964, and approved their purchase. Accordingly, the Wood & Hogan claim is allowed in the amount of $598.
The next item concerns amounts paid to Edgar E. Dennison for wiring of lamps and similar work. Mr. Dennison never dealt with anyone other than Dr. Walker, and his testimony does not in any way support the claim. Mrs. Huebner testified that Mr. Huebner had seen some of Mr. Dennison’s work and had approved it, but the balance of the evidence is so vague and conflicting as to when and under what circumstances the work was done that the necessary standard of proof has not been met. Mr. Dennison had no records or recollection as to when the work was done, and the credibility of the whole affair was not helped by Mr. Dennison’s admission that he wrote out his billing (Exhibit 6 to the statement of claim), including the date which he put upon it, only at Dr. Walker’s request and solely for the purpose of these proceedings. The Edgar E. Dennison claim is disallowed.
The next item is a billing for $233 from T. G. Ashjean Interiors, Inc. The invoice concerning this claim is undated, but the items were not paid for by Dr. Walker until October 1965. The record is devoid of any facts from which the court could conclude that Mr. Huebner approved the purchase of these items. Mrs. Huebner’s testimony alone will not do for this purpose, and the Ashjean claim is disallowed.
The next claim is for $2,192 for sums paid to Anthony DeFrancesco. Mr. DeFrancesco constructs and repairs furnishings. Here, again, the supplier worked exclusively for Dr. Walker, and by his own testimony was unaware of any other person for whom Dr. Walker might have been acting. The testimony as to when the work was ordered and done is in *423 conclusive, to say the least, and did not help claimant prove that Mr. Huebner approved these purchases. It is understandable that small business people, as Mr. DeFrancesco and others of these suppliers are, utilize limited records which, years later, may not reveal the details of a transaction. Nevertheless, surmise cannot replace competent proof; while Dr. Walker might well not have made the purchases without believing he had the right to do so, the conclusions reached must be from the record as made, and the DeFrancesco claim is disallowed.
The claim for purchases from Authentic Shops, Inc., in the amount of $2,998.54, follow next. The services involved here were reupholstering of existing furniture, and making pillows, bolsters and other decorative items to match. Invoices evidencing the work were attached to the statement of claim as exhibit 11, and were variously dated from July 14, 1965, through June 15, 1966. They were typewritten, but in handwriting under the various order numbers were dates appearing to be when the order was placed, many of these being March 19, 1965. Exactly how the covering materials were selected, or who selected them, is uncertain, except that there is no evidence that Mr. Huebner did so. The proprietor of the business, Mr. Robert Solts, was called to explain and substantiate the information set forth on the invoices, but proved of little assistance. Mr. Solts is an artist and decorator, not an accountant, and became confused when he attempted to analyze his records to obtain information concerning order dates, the times when work was done or merchandise delivered, and the like. Further, he mixed up orders concerned in this proceeding with other orders for Dr. Walker, and made other mistakes. While these are understandable, they nevertheless have a damaging effect on credibil *424 ity, and we conclude that no liability on the estate has been shown. The Authentic Shops claim is disallowed.
There remains a number of smaller miscellaneous claims, which can be disposed of briefly. The facts of these for the sake of simplicity were embodied in a stipulation. Analysis of these facts, however, shows that the uncertainties present in the prior claims with reference to Mr. Huebner’s knowledge and approval of the purchases are present here also. The stipulation is not too helpful in this respect, and it is doubtful that any stipulation could have been obtained which would have spelled out this aspect of the problem. In adjudicating these matters, therefore, the court is guided by the circumstances of each, attempting to determine from them whether it is reasonable to conclude that the particular items involved were acquired with the approval of Mr. Huebner. The following claims are allowed:
(1) Callahan Marble Shop, for a hutch top purchased not later than January 22, 1965, and delivered and paid for before Mr. Huebner’s death, $120.50.
(2) Laughlin Frames, Inc., for picture frames ordered in August 1964, $58.20.
(3) D. Miller, for lamp shades ordered prior to May 26, 1965, and paid for and delivered before Mr. Huebner’s death, $34.
(4) Thomas V. Barnes, for a pie crust table and other woodworking services rendered in February and March of 1965, $187.
(5) Kiesling-Hess Finishing Co., Inc., for scotch-guarding fabrics in December 1964, $11.
(6) Lackawanna Leather Co., for leather upholstery delivered to Wood & Hogan for use on the wing chairs supplied by them, $190.69.
In the above cases, the court believes, either because *425 of the type of merchandise or the dates when the transactions occurred, that Mr. Huebner must have been aware of the transactions. As to the balance of the claims set forth in the stipulation, we find the reverse to be true, and that claimant has failed to show any circumstances allowing a reasonable inference that Mr. Huebner approved purchase of the items or services.
Marlyn F. Smith, of Fligh, Swartz, Roberts & Seidel; Angus M. Russell and Richard P. Brown, Jr., of Morgan, Lewis &■ Bockius, for accountant.
Desmond J. McTighe, of McTighe, Koch, Brown & Weiss, for claimant.
December 10, 1970.
All claims or parts of claims not specifically allowed in this supplementary adjudication are dismissed. For reasons set forth herein, the claim of James G. Walker is allowed in the amount of $30,861.97, and the same is hereby awarded to him.
And now, June 24, 1970, this supplementary adjudication is confirmed nisi.
OPINION SUR EXCEPTIONS TO SUPPLEMENTAL ADJUDICATION
TAXIS, P. J.,
— Fifteen exceptions have been filed by the estate to the supplemental adjudication of this court dated June 24, 1970, which allowed a claim by Dr. James G. Walker in the amount of $30,861.97. No repetition of the facts is necessary here. Even though some of the exceptions go to our findings of fact, we still believe that the record as it stands provides ample support for them. The more important issues raised by the estate relate to two errors of law allegedly committed by the court in the course of its prior decision. These will be discussed separately.
*426 I. Incompetence of Sarah W. Huebner To Testify
Sarah W. Huebner is decedent’s surviving spouse and receives one-half of his estate. She is also the sister of the claimant and testified in his behalf. It may be said that her testimony is well-nigh indispensable to the success of the portion of the claim which was allowed, and it is undeniable, therefore, that an error as to its admission would be highly prejudicial to the estate.
The assertion of incompetence is based, of course, on the dead man’s rule of May 23, 1887, P. L. 158, sec. 5(e), 28 PS §322. However, after extended consideration, we conclude that Mrs. Huebner was competent. Competence is the rule under the act, incompetence the exception: Waugaman v. Henry, 75 Pa. Superior Ct. 94. The burden is thus upon the estate to show that Mrs. Huebner would either gain or lose as a direct legal consequence of the judgment or that the present record can be used either for or against her in another action; she must be shown to have a certain and vested interest in the outcome, and not merely a remote or contingent involvement: Suckling v. Pennsylvania Threshermen, etc., 426 Pa. 503. Such lesser interests go to credibility (Dillon’s Estate, 269 Pa. 234), not to admissibility.
It would initially appear that Mrs. Huebner’s only possible interest in this proceeding is as an heir of her husband. As such, her testimony on behalf of the claimant would be to her disadvantage, as her distributive share would be reduced by one-half of any amount awarded to Dr. Walker. The matter is made more complicated, however, by a matter originally brought into the case in claimant’s statement of claim, an allegation that decedent purchased the furnishings and other items which are the subject of Dr. Walker’s claim in order to give them to his wife. Some testi *427 mony indicated that this might be so, but as the matter was not directly involved in Dr. Walker’s claim, it was properly not completely explored at the hearings. However, the estate now argues that this fact has reversed Mrs. Huebner’s overall interest from an heir adverse to claimant to a donee who desires to have her gifts paid for.
It is first argued that a decision in favor of the estate would conclusively establish that the property in question still belongs to Dr. Walker, and might, therefore, be retaken by him from the present possession of Mrs. Huebner, if necessary by legal proceedings. On the other hand, it is asserted that a decision against the estate, while technically establishing ownership in the estate only, would not at all prevent Mrs. Huebner from proving the alleged gift, if the estate acted to assert its ownership. No doubt it would increase Mrs. Huebner’s chances of prevailing in such an action if the property had first been paid for and the interest of Dr. Walker favorably disposed of.
We reject these arguments as speculative, and believe that Mrs. Huebner’s interest in the proceedings is uncertain and contingent, not direct, as required by the leading case of Dillon’s Estate, supra. There, it was held that the bare possibility that a later action might be brought against decedent’s agent, to impose personal liability on her if a claim against the estate on a contract were disallowed, did not disqualify. Further, in Billow v. Billow, 36,0 Pa. 343, a surviving partner was allowed to testify against the deceased partner’s estate and on behalf of a creditor of the partnership, and it was said:
“Moreover, the adverse interest upon which disqualification depends must be in the immediate result of the particular suit and not in its effect on other possible actions or circumstances; remote con *428 si derations, such as a possible right of indemnity or contribution under which a witness might have an adverse interest, are not to be considered if his interest is not adverse so far as the suit is concerned in which his testimony is given: . .
Similarly remote interests were involved in Hart, Schaffner & Marx v. Koch, 107 Pa. Superior Ct. 528, and in Gaston Estate, 361 Pa. 105, and in each case held not to affect competence. Every case, of course, must be dealt with on the basis of its particular facts; but whether or not Mr. Huebner purchased the property involved in this litigation in order to give it to his wife, in contradistinction to simply using it to furnish their residence, is an issue outside and remote from the merits of Dr. Walker’s claim. While it may be that rejection of the claim would have established Dr. Walker’s ownership of the property, this could create an adverse interest in Mrs. Huebner only if she had been given the property by Mr. Huebner, at best an uncertain and contingent issue not resolved by the record before us and not actually within its purview. In short, it is possible that an adverse interest in Mrs. Huebner might develop as the result of another and later legal action, but that is insufficient to prevent her from testifying in this one: Dillon’s Estate, supra.
Counsel for the estate has lately drawn our attention to an unreported decision of the Philadelphia Orphans’ Court, the Estate of Wilbur H. Hamilton, dec., no. 1459 of 1966. In that case, a claim was filed against the estate for repayment of a $25,000 loan allegedly made to decedent by claimant. Claimant, who never possessed such a sum, had asked her father to make the loan from his funds, which he did. The court held that the father, if his testimony were true, was himself the real claimant, and, hence, incompetent to testify for his daughter. It was abundantly clear *429 that recovery by claimant was absolutely equal to recovery by the witness, her father, since the only reason claimant ever received the funds from her father, if she did, was to lend them to decedent. They were in so sense her funds at the time of the loan. In Huebner, however, there is no suggestion that Mrs. Huebner is entitled to any of the funds which Dr. Walker has been awarded. It remains clear that if Mrs. Huebner ever benefits economically from Dr. Walker’s recovery, it will only be in a collateral and indirect manner, via litigation yet to occur.
II. Statute of Frauds
Here, the estate argues that the statute of frauds contained in section 2-201 of the Uniform Commercial Code, 12A PS §2-201, bars Dr. Walker’s claim for the property allegedly purchased by decedent directly from him. Our reason for holding the statute of frauds inapplicable was that the contract between Dr. Walker and decedent was essentially for the service of decorating decedent’s home, involving design, arrangement, selection and other areas for the exercise of artistic discretion, as well as the actual supplying of pieces owned by Dr. Walker, and others, in order to carry out the overall design and plan. We remain of this opinion, under the unique circumstances of the case.
As a further reason for rejecting the blanket application of the statute urged upon us, we note that there is no basis whatever for regarding the transactions between Dr. Walker and decedent as based on only one sales contract, even if the matter be viewed as a sale of goods. The pieces were selected and transferred on a multitude of different occasions, for varied reasons and purposes; for the most part, the acquisition of one piece or one group of pieces from Dr. Walker’s collection was not related to or *430 dependent upon what was done with reference to any other items. There were, therefore, almost as many separate sales as there were items transferred, only two or three of which exceeded $500 in value.
In addition, we believe that, even if applicable, the statute of frauds has been complied with by the acceptance and receipt of the property by decedent. See section 2-201, supra, clause (3)(c). “Acceptance,” as defined in section 2-606, is not physical, but is a state of mind signifying a willingness on the part of the buyer to take the property; this is clearly present here and, as a matter of fact, lies at the core of the estate’s liability in the first place. “Receipt,” on the other hand, corresponds to physical delivery, section 2-103, but we are satisfied by the testimony here-that almost all of the property which is the subject of this claim was delivered before decedent’s death, and if Dr. Owens and the other witnesses to this effect were less than absolutely certain at points, this does not render them incredible in a matter involving such a vast number of items. For all these reasons, we do not believe that recovery is barred by the statute of frauds.
Accordingly, all of the exceptions to the supplemental adjudication are dismissed.